UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| GREGORY JACOB, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>YOKO SAVINO, D.O., et al. )<br>)<br>Defendants. ) | No. 1:19-cv-00844-SEB-TAB |

**Order Granting Defendant Savino's Motion for Summary Judgment and
Granting Defendants Huffard and Mitcheff's Motion for Summary Judgment**

Plaintiff Gregory Jacob, an inmate in the Indiana Department of Correction, filed this civil rights action alleging that the defendants were deliberately indifferent to his serious medical needs, thereby violating his Eighth Amendment right to be free from cruel and unusual punishment. The defendants have moved for summary judgment.

### I.     Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Inadmissible evidence, including hearsay, cannot create a material issue of fact. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016).

The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and need not "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

## II.  Facts

Except where noted, the following facts are undisputed. The defendants in this action are Dr. Yoko Savino, Dr. Michael Mitcheff, and Mr. Chris Huffard. Since March 2016, Mr. Jacob has been in custody at the Correctional Industrial Facility (CIF), where the relevant events occurred. Mr. Jacob's allegations cover two unrelated medical conditions. The Court will summarize the facts of each separately.

### A.  Arm Weakness

Mr. Jacob sustained a gunshot wound to his right upper arm in 2002.

In November 2016, he was treated by a physical therapist at CIF. Dkt. 56-1 at 1–4 (medical records). Mr. Jacob had been assigned to a top bunk, and he wanted a bottom bunk pass like he had at previous institutions. *Id.* at 1, 3. The physical therapist noted "some atrophy" in Mr. Jacob's right forearm and hand, but found that his range of motion and strength were within normal limits. *Id.* at 1, 3. The physical therapist told Mr. Jacob he would have to request a bottom bunk pass from a physician.

In April 2017, Mr. Jacob reported to a CIF treatment provider that he suffered from "moderate" nerve damage in his right arm.[1] *Id.* at 5. The provider ordered him a six-month bottom bunk pass. *Id.* at 7.

In July 2017, a different CIF provider examined Mr. Jacob and found that he was able to perform the activities of daily living. *Id.* at 11. This provider recommended "Low bunk denies" going forward. *Id.* In October 2017, a CIF doctor likewise found that Mr. Jacob did not meet the qualifications for a bottom bunk pass and declined to renew the order. *Id.* at 30. One week later, Mr. Jacob reported that he fell off the ladder twice while trying to climb into his top bunk. *Id.* at 33. Mr. Jacob's bottom bunk pass was officially cancelled on November 16, 2017. *Id.* at 37.

Mr. Jacob was treated by Dr. Savino for the first time in August 2018. Dkt. 52-5 at 10–11 (Jacob deposition). He asked her to renew his bottom bunk pass, but she refused. *Id.* He remained assigned to a bottom bunk until January 3, 2019.[2] *Id.* at 12–13. Early the next morning, Mr. Jacob fell from the top bunk and injured his ribs. *Id.*; *see also* dkt. 56-1 at 91.

Mr. Jacob's x-ray results revealed no abnormality. Dkt. 56-1 at 113. Dr. Savino ordered Mr. Jacob a two-week bottom bunk pass while his ribs healed, but she did not renew it. *Id.* at 97. Mr. Jacob asserted that he has a "[g]ross neurological disfunction," but Dr. Savino concluded that he did not. *See id.* at 93, 95. Despite not having an active medical pass, Mr. Jacob has remained assigned to a bottom bunk since January 2019. Dkt. 52-5 at 14.

---

[1] Mr. Jacob asserts that Dr. Rogan made this assessment and ordered him a bottom bunk pass on April 6, 2017. Dkt. 58 at 11. But his medical records list Nurse Practitioner Barbara A. Brubaker as the provider on this date. Dkt. 56-1 at 8. Dr. Michael Rogan is noted only in relation to Mr. Jacob's hepatitis C treatment. *Id.* at 5. Regardless, the identity of the provider who ordered Mr. Jacob a bottom bunk pass in April 2017 is immaterial.

[2] Mr. Jacob does not reconcile his reports to medical personnel that he fell from the bunk ladder in October 2017, *see* dkt. 56-1 at 33, with his deposition testimony that he remained assigned to a bottom bunk until January 2019, dkt. 52-5 at 14.

### B. Skin Condition

Mr. Jacob suffers from an itchy rash on his scalp, face, neck, and chest. In April 2017, Mr. Jacob reported the condition as "moderate." Dkt. 56-1 at 5. A medical provider's notes indicate that "antibiotic keeps the sores gone." *Id.*

In July 2017, Mr. Jacob was treated at a chronic care visit for hepatitis, folliculitis, and hypothyroid. Under "folliculitis," the provider noted a "history of raised bumps on posterior scalp which has improved." *Id.* at 9. The provider recommended maintaining the antibiotic treatment. *Id.* at 2.

In October 2017, Mr. Jacob requested a renewal of his antibiotic. *Id.* at 21. It was renewed at his next chronic care visit several weeks later. *Id.* at 35.

In December 2017, Mr. Jacob visited a nurse to request a renewal of his antibiotic. The nurse referred him to a doctor and noted "no signs of active folliculitis at this time." *Id.* at 40. In January 2018, Mr. Jacob visited a doctor who noted "[f]olliculitis type inflammation" and renewed the prescription for an antibiotic. *Id.* at 50.

In April 2018, Mr. Jacob visited a doctor for chronic folliculitis. *Id.* at 61. The doctor noted that the symptoms were "getting better" but that Mr. Jacob "still ha[d] some active spots." *Id.* The doctor changed Mr. Jacob's antibiotic prescription and ordered automatic refills. *Id.* at 62.

In July 2018, Mr. Jacob reported that the new antibiotic was less effective and that he wanted to try something else. *Id.* at 65. A doctor recommended referring Mr. Jacob to an outside specialist. *Id.* at 66. Dr. Mitcheff ordered an alternative treatment of a steroid cream before referring Mr. Jacob for outside treatment. *Id.* at 71.

In August 2018, Dr. Savino treated Mr. Jacob for the first time. *Id.* at 74. Mr. Jacob reported had not been using the steroid cream to treat his folliculitis. *Id.* Despite the lack of recent treatment,

his symptoms presented as "very mild." *Id.* Dr. Savino directed Mr. Jacob to use the steroid and prescribed an antibiotic cream. *Id.* at 74−75.

In October 2018, Dr. Savino treated Mr. Jacob for hepatitis C. She noted that Mr. Jacob's oral antibiotic treatment was damaging his liver. *Id.* at 83. Mr. Jacob reported that the antibiotic "work[ed] well" and that he "really need[ed] it." *Id.* After a "[l]engthy discussion," Dr. Savino recommended reducing Mr. Jacob's daily oral antibiotic dosage and explained that the antibiotic would be discontinued if the liver damage continued to worsen. *Id.* On January 7, 2019, after testing revealed continued liver damage, Dr. Savino discontinued the antibiotic treatment. Dkt. 56-3 at 2, ¶ 7 (Savino affidavit).

On March 26, 2019, Mr. Jacob saw a nurse for folliculitis. Dkt. 56-1 at 165. He presented with bumps on his face, on the back of his head, and behind his ears. *Id.* at 169. Three days later, Dr. Savino treated Mr. Jacob for the same condition. Mr. Jacob requested a specific antibiotic, but Dr. Savino reminded him that an antibiotic treatment would negatively affect his liver. *Id.* at 173. She continued Mr. Jacob's prescription for a steroid cream.

On April 3, 2019, Dr. Savino treated Mr. Jacob for folliculitis. She noted that Mr. Jacob's skin problem was "mild at this point although [Mr. Jacob] tends to talk as if he has very severe folliculitis." *Id.* at 183. Dr. Savino noted that the previously prescribed steroid cream was not on the prison's formulary list, so she ordered an alternative. *Id.* at 185.

On April 19, 2019, at Dr. Mitcheff's request, Health Services Administrator Chris Huffard took photographs of Mr. Jacob's skin. Dkt. 52-1 at 2, ¶¶ 8−9 (Huffard affidavit). According Mr. Jacob, Mr. Huffard told him at this visit that he would try to help Mr. Jacob. Dkt. 56-2 at 4. Mr. Huffard has since not responded to communications from Mr. Jacob. *Id.* at 5.

Also on April 19, Mr. Huffard emailed Dr. Mitcheff, Dr. Savino, and two CIF nurses that same date regarding Mr. Jacob's treatment. Dkt. 52-4 at 1. He followed up on May 1, 2019, prompting CIF medical staff to schedule Mr. Jacob for a provider visit. *Id.*

Mr. Jacob was deposed on February 12, 2020. He acknowledged not having any visible sores and described his current condition as mild. *Id.* at 10, 17. But he predicted it would get worse in the "[n]ext couple of days."

### III.   Discussion

To prevail on an Eighth Amendment claim based on deliberate indifference to serious medical needs, a plaintiff must show that (1) he suffered from an objectively serious medical condition and (2) the defendant knew about his condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Knight v. Grossman*, 942 F.3d 336, 340 (7th Cir. 2019). Negligence is not enough. *Knight*, 942 F.3d at 340. "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

Mr. Jacob alleges that Dr. Savino was deliberately indifferent to his need for a bottom bunk pass and that Dr. Savino, Dr. Mitcheff, and Mr. Huffard were deliberately indifferent to his skin condition. The Court will consider the summary judgment arguments for each claim separately.

### A.  Bottom Bunk Pass

For purposes of this motion, the Court assumes that Mr. Jacob's arm injury constitutes a serious medical condition. Even with that assumption, Mr. Jacob has not presented evidence that would allow a reasonable juror to find that Dr. Savino was deliberately indifferent to his condition.

Dr. Savino denied a bottom bunk pass based on her assessment that Mr. Jacob did not meet any of Wexford's formulary bases for the pass. Dkt. 56-1 at 93, 95. Perhaps best practice would have been to look beyond the formulary bases, but the Constitution does not require best practices; it requires only "minimally competent" care. *Pyles*, 771 F.3d at 409. Dr. Savino easily clears this low bar. Mr. Jacob's records show that the strength and range of motion in his right arm were within normal limits. Dkt. 56-1 at 1, 3 (physical therapist assessment); *id.* at 11 (nurse practitioner assessment). And while another provider had issued Mr. Jacob a bottom bunk pass, there is no evidence that the provider issued the pass based on anything other than Mr. Jacob's own conclusion that he could not climb the ladder. *Id.* at 5, 7. Dr. Savino was not required to accept that conclusion. *Pyles*, 771 F.3d at 409.

To the extent Mr. Jacob alleges that Dr. Mitcheff was deliberately indifferent to Mr. Jacob's need for a bottom bunk pass, Dr. Mitcheff is entitled to summary judgment for the same reasons as Dr. Savino.

### B.  Skin Condition

For purposes of this motion, the defendants do not dispute that Mr. Jacob's skin condition is a serious medical condition. They each argue, however, that they were not deliberately indifferent to that condition.

### 1. Dr. Savino

From the first time Dr. Savino treated Mr. Jacob in August 2018, she actively treated his skin condition. Even though Mr. Jacob's skin condition was "very mild" on the date Dr. Savino first saw him, she prescribed an antibiotic cream in addition to the steroid cream and oral antibiotic he had already been prescribed. When tests later showed that the oral antibiotic was damaging Mr. Jacob's liver, Dr. Savino reduced the daily dosage and eventually discontinued the prescription. Still, she monitored the rash and maintained a prescription for the steroid cream.

Mr. Jacob insists that Dr. Savino should have referred him to an outside specialist and that anything less constitutes deliberate indifference. Dkt. 58 at He argues that an outside specialist is necessary because the CIF doctors have not even identified his skin condition and have merely guessed that it is folliculitis. *Id.* at 13−14. But there is no evidence that Mr. Jacob was misdiagnosed. Indeed, Mr. Jacob acknowledged before filing suit that the oral antibiotic prescribed for folliculitis worked well to treat his skin condition. Dkt. 56-1 at 83. The trouble for Mr. Jacob is that the most effective treatment for his skin condition—an oral antibiotic—also threatens to kill him. Dr. Savino exercised her medical judgment to decrease the dosage and ultimately discontinue the medicine. The result is that Mr. Jacob's skin condition sometimes flares up, causing Mr. Jacob real pain and discomfort. Dr. Savino ordered treatment to minimize that pain and discomfort. She has not done everything Mr. Jacob would like, but she has done enough that no juror could find she was less than minimally competent. *Pyles*, 771 F.3d at 409.

### 2. Dr. Mitcheff

As with Dr. Savino, Mr. Jacob's claim against Dr. Mitcheff centers on the denial of his request to see an outside specialist. A CIF doctor suggested referring Mr. Jacob to an outside specialist in July 2018. Dkt. 56-1 at 66. Instead, Dr. Mitcheff ordered an alternative treatment of a

steroid cream and directed the doctor to re-present the outside referral if the steroid cream was ineffective. *Id.* at 71. After that date, Mr. Jacob's treating physician, Dr. Savino, did not recommend an outside specialist. She continued treating him for folliculitis, as the antibiotic regimen previously prescribed for that disease was effective. *Id.* at 83. Dr. Savino noted on multiple occasions that Mr. Jacob's skin condition was "mild" or "very mild." *Id.* at 74 (August 15, 2018), 183 (April 3, 2019). And she continued to provide treatment that would not cause potentially fatal liver damage. No reasonable jury would find that Dr. Mitcheff was deliberately indifferent for allowing Dr. Savino to continue her course of treatment instead of ordering a referral to an outside specialist.

### 3. Mr. Huffard

No reasonable juror could find that Mr. Huffard was deliberately indifferent to Mr. Jacob's skin condition. There is no evidence that Mr. Huffard had any authority to override Dr. Savino's treatment decisions by ordering an outside referral. Likewise, there is no evidence that he stymied any effort to have Mr. Jacob treated by an outside specialist. Mr. Huffard's only apparent role in Mr. Jacob's treatment was taking pictures of his skin on April 19, 2019, and—according to Mr. Jacob—offering to help him get effective treatment.

On April 19, 2019, Mr. Huffard emailed Dr. Mitcheff, Dr. Savino, and two CIF nurses regarding Mr. Jacob's treatment. Dkt. 52-4 at 1. And he followed up on May 1, 2019, prompting CIF medical staff to schedule Mr. Jacob for a provider visit. *Id.* His emails reflect a familiarity with Mr. Jacob's medical records. *Id.* In short, the record shows that Mr. Huffard took appropriate actions to help Mr. Jacob receive treatment for his skin condition.

### IV. Conclusion

The defendants' motions for summary judgment, dkts. [50] and [54], are **granted**. Final judgment shall now enter.

**IT IS SO ORDERED.**

Date:   2/8/2021

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

GREGORY JACOB
129992
PENDLETON – CIF
CORRECTIONAL INDUSTRIAL FACILITY
Inmate Mail/Parcels
5124 West Reformatory Road
PENDLETON, IN 46064

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Rachel D. Johnson
KATZ  KORIN CUNNINGHAM, P.C.
rjohnson@kkclegal.com

Blair Martin Roembke
EICHHORN & EICHHORN LLP (Indianapolis)
broembke@eichhorn-law.com

Michael Roth
EICHHORN & EICHHORN
mroth@eichhorn-law.com

Kayla Marie Zimmerman
EICHHORN & EICHHORN LLP (Indianapolis)
kzimmerman@eichhorn-law.com